IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ANTHONY C. GORE,

      Petitioner,

  v.

ROBERT A. HOREL, Warden,

      Respondent.

_____/

No. C 08-04365 CW (PR)

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; GRANTING CERTIFICATE OF APPEALABILITY

    Petitioner Anthony Clark Gore is a prisoner of the State of California, incarcerated at California Medical Facility.  On September 17, 2008, Petitioner filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the validity of his 2005 state conviction.  Respondent opposes the petition.  Petitioner has not filed a traverse.  Having considered all of the papers filed by the parties, the Court DENIES the petition.

BACKGROUND

    The following is a summary of the facts taken from the December 5, 2007 state appellate court's unpublished opinion on direct appeal.  Respondent. Ex. F[1], <u>People v. Gore</u>, No. A112059, 2007 WL 4248859 at *1-6 (Cal. Ct. App. 1 Dist. Dec. 5, 2007).

_____

    [1] All references herein to exhibits are to the exhibits submitted by Respondent in support of the Answer.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

A. Wagner's Death

Petitioner was a patient at Napa State Mental Hospital.[2]  He shared a room at the hospital with patient Dennis Wagner.  Between 7:00 and 7:30, on the morning of May 3, 2002, another patient, Randy Robertson, found Wagner in his bed, not breathing.  Wagner's face was swollen, as if he had been in a fight.  Petitioner was lying awake on his bed.  Robertson asked Petitioner what was wrong with Wagner, and Petitioner answered, "The mother fucker's asleep." Robertson went to get a nurse, James Miller, who came to the room. Petitioner was lying on his bed, on his back, with his arms folded behind his head.  He looked at Miller without saying anything. Miller saw that Wagner had no pulse and that his neck and upper mouth areas were swollen.  Miller and other medical personnel tried for twenty to thirty minutes to resuscitate Wagner.  During the first fifteen minutes of that time, Petitioner continued to lie fully dressed on his back, shoes on, with his arms folded behind his head, appearing relaxed.  Petitioner watched the resuscitation attempts and looked at the ceiling without moving.  Miller suspected Petitioner had been involved in Wagner's death, and told one of the police officers who had come to the room, "You need to watch him."  Miller also told a nurse, Judith Boan, that he thought Petitioner was responsible for Wagner's death.

A paramedic who was called around 8:00 or 8:30 pronounced Wagner dead, and concluded he had been dead for an hour or two. Wagner had died of asphyxia due to manual strangulation.  His face

---

[2] Petitioner had been found not guilty of an assault in 1999 by reason of insanity, and was committed to the mental hospital.

2

and neck were bruised, there was redness along the jaw and an
abrasion on the chin, and blood had come from his mouth.

B. Aftermath of Wagner's Death and Investigation

During the resuscitation, Boan asked Petitioner to leave the
room.  Accompanied by three uniformed officers, Petitioner went
with her to a seclusion room without saying anything.  An officer
stood at the door of the seclusion room to make sure Petitioner did
not leave.  When Miller told Boan he thought Petitioner might have
been Wagner's killer, Boan wanted to see Petitioner's body to see
if he had any wounds.  Petitioner responded to her directions and
appeared to know his surroundings, and Boan did not see indications
of any psychiatric problems.  There were spots of blood on
Petitioner's shirt, sweat pants and shoes.  Boan told Petitioner to
remove his outer clothing, and he did so.  Petitioner's only injury
was on his right hand where there was coagulated blood.  Boan asked
Petitioner what had happened to his knuckle, and he did not
respond.  One of the officers asked Petitioner how he had injured
himself, and he said he had hit a wall the previous day.  The
officer asked Petitioner how he had gotten blood on his knee, and
he said he had fallen in the courtyard the previous day.
Petitioner appeared to understand the questions, and answered them
calmly and directly, although he had a "blank stare on his face."

Later that morning, Jon Crawford, a detective from the Napa
County Sheriff's Department, went with another detective to speak
with Petitioner.  They wanted to "see where [Petitioner] was
mentally," and to find out whether he would give a statement.  They
saw that Petitioner's hands were swollen, and that his right hand,
particularly the knuckle area, was more swollen than the left.

3

Crawford and other officers saw Petitioner again approximately two hours later. They told Petitioner they wanted to collect evidence from his person, and asked if he would be willing to cooperate. Petitioner told them he would not cooperate and that he would fight the officers to stop them from collecting evidence. The officers handcuffed Petitioner, and he struggled as they undressed him and collected evidence. They told Petitioner he was under arrest for killing Wagner.

DNA analysis revealed that the blood on Petitioner's sweat pants and shirt had come from Wagner. The blood on Petitioner's shoe was his own.

C. Petitioner's Prior Dealings with Wagner

A patient at Napa State Hospital, Canada Coburn, testified that she had bought drugs from Petitioner many times. Petitioner sold marijuana cigarettes for ten dollars cash, or twenty dollars credit. Several weeks before Wagner's death, Wagner obtained a marijuana cigarette from Petitioner without paying. At the time, Petitioner told Wagner he had "better pay up[,] fool." About three days before Wagner was killed, Coburn spoke with Wagner on the telephone. Wagner told Coburn he feared for his life because he could not pay Petitioner what he owed for the marijuana. Wagner then handed the telephone to Petitioner, who told Coburn that Wagner had "fucked up and that he needed to pay up," and that something was going to happen to Wagner because he could not pay what he owed. When Coburn protested, Petitioner told her Wagner had "made his own bed" and "had to lay in it." Around the time that Wagner received the marijuana from Petitioner, Coburn had noticed Petitioner becoming more violent. She thought he "wasn't

really thinking straight, he was really religious and really paranoid."

The day before Wagner died, Petitioner told his friend Rena Hess, another patient at the hospital, that he was upset about not getting his money from Wagner and that Wagner "was going to be squashed that night if he didn't get his money."  That evening, Petitioner told Hess something to the effect that he was going to "take care of the situation, that he was going to . . . do something to him, basically just kill him."  In that conversation, Petitioner told Hess he was hearing voices.  When Hess spoke with Petitioner after he had been arrested, Petitioner initially told her he had killed Wagner, but the next day he indicated he had not been serious.  At one point, Petitioner told her he felt bad about having killed Wagner.

One or two days before Wagner's death, Petitioner told another patient, Forrest Kendrid, that he was upset about Wagner not paying him back and that Wagner had to be "dealt with" (which Kendrid testified was slang for killing), or that Petitioner was "going to kill that punk mother fucker," and that Wagner had to be made an example.  Kendrid offered to pay the debt himself, but Petitioner refused, saying "it's the principle of the thing."

D. Petitioner's Mental State

At trial, Petitioner did not take the position that he had not killed Wagner.  Instead, Petitioner argued that because of his mental illness, he did not form the intent and mental state necessary for murder.  In his defense, Petitioner presented evidence that he was required to take antipsychotic medication at the time of Wagner's death.  A quarterly evaluation of Petitioner

United States District Court
For the Northern District of California

in 2002 indicated that he was not ready to be released to the community because he was not totally in remission. Other hospital residents testified that Petitioner had been in fights with two other patients, James Foster and Robertson, during April 2002, and one patient had observed that Petitioner had said odd things and appeared "tripped out" or "psychotic" in the days before those fights. A resident testified that a few days before Wagner's death, Petitioner yelled about God in a manner the resident could not understand, behaved bizarrely and spoke in a disjointed fashion. In the days before Wagner's death, Petitioner would stay up all night in his room, praying and pacing, and on at least one occasion, a nurse saw him appearing agitated and delusional. A psychiatric social worker saw Petitioner in a seclusion room in five-point restraints on April 8, 2002, something that is usually done after an assault. She tried to discuss one of the fights with him; Petitioner did not want to talk, but showed no signs of internal stimuli or delirium. Between approximately April 16 and April 24, 2002, Petitioner was under constant in-sight observation, which is used when a patient is a danger to himself or others. Up until Wagner's death or the day before it, he was being observed at frequent intervals. On one or both of the two days preceding Wagner's death, Petitioner refused his medications. Staff members had asked him to cooperate in taking his medications, but had not forced him to do so. His medications had been ordered "crushed" as of April 29, 2002, to reduce the chances of his "cheeking" them, or failing to swallow them and throwing them out later.

Dr. Bruce Victor, a psychiatrist who testified as an expert witness on Petitioner's behalf, was of the opinion that Petitioner

6

United States District Court
For the Northern District of California

suffered from chronic paranoid schizophrenia, with polysubstance abuse and antisocial personality disorder, and that Petitioner's condition may have been exacerbated by the use of methamphetamine. Victor also testified that medications are available to calm the symptoms of schizophrenia, and that withdrawal from the medications can cause agitation and sleeplessness.  In both instances of Petitioner's April 2002 assaults on other patients, there was evidence that Petitioner had experienced command hallucinations, in one instance through a wall.  Petitioner had also been increasingly preoccupied with religion and had been praying fervently, in a way that was not characteristic of his behavior when his mental state was healthier.  Victor also testified that Petitioner had never given him a psychotic reason for killing Wagner, and in fact had denied having killed him.  Petitioner had also told Victor he had not heard voices regarding Wagner.

Dr. Kevin Kappler, a psychologist at Napa State Hospital, testified for the prosecution.  Kappler was part of Petitioner's treatment team.  During 2002, Petitioner did not cooperate with his treatment plan.  Petitioner refused medications, refused to go to therapy groups and sometimes refused to meet with his treatment team.  Kappler believed Petitioner might be feigning his mental illness.  Petitioner would refuse his psychotropic medications and request morphine instead.  Sometime in the months before killing Wagner, Petitioner told Kappler he did not want to be in the hospital, that he was "a felon in between crimes" and that he would rather be in jail, where he could get better drugs.  Kappler saw no signs of delusions, and Petitioner did not tell him of any hallucinations.

United States District Court
For the Northern District of California

Dr. Madeline Andrew, a forensic psychiatrist, testified as an expert witness for the prosecution.  She agreed with Victor's diagnosis of Petitioner.  Although Petitioner had been trying to "cheek" his medications, Andrew believed the medical records showed that Petitioner had generally been ingesting them.  She testified that crushing medications was effective in preventing a patient from cheeking medications.  She also testified that when a patient stops taking medication, it can take some time for the medication to be cleared out of the body, and symptoms may not recur for days, weeks or even months.  Although Petitioner seemed to have missed two or three doses of medication on May 1 and 2, 2002, Andrew did not believe the missed doses significantly affected the level of medication in his blood.  She believed the disturbance in Petitioner's sleep patterns was voluntary, and that he preferred to sleep during the day and be awake at night.

Andrew also testified about the results of drug tests on Petitioner.  In January 2002, Petitioner tested positive for cocaine.  In February 2002, he tested negative for all drugs.  He had a positive drug screen for phenobarbital, a barbiturate, in March 2002; a positive test for amphetamine, methamphetamine and phenobarbital April 9, 2002, after he had assaulted two other patients; and another positive test for phenobarbital on April 16, 2002.  Petitioner was placed on constant in-sight observation from that time until April 24, when he was reduced to fifteen-minute checks.  On April 26, the observations were reduced to every thirty minutes, and those observations were discontinued on May 1.  A screen on May 3, 2002, after Petitioner had been arrested for killing Wagner, was negative for all drugs.  Although Petitioner

United States District Court
For the Northern District of California

was diagnosed in April with phenobarbital withdrawal, which can
cause behavioral changes, agitation, anxiety, paranoia and
delusions or hallucinations, Andrew concluded that symptoms of
withdrawal had ended by April 24, 2002, at the latest.  Based in
part on Petitioner's physical symptoms during April, including
elevated blood pressure and heart rate, Andrew believed that the
symptoms Petitioner experienced in April, at the time he was put in
restraints, were predominantly due to barbiturate withdrawal,
rather than to his schizophrenia.  Petitioner's records indicated
to Andrew that his condition was generally improving up until the
time of the killing.  Andrew testified that people with paranoid
schizophrenia and antisocial personality disorder are capable of
thinking rationally at times and of planning and carrying out
crimes.

E. Sanity Phase of Trial

On September 8, 2005, the jury found Petitioner guilty of
first degree murder, and the sanity phase of the trial ensued.  All
evidence from the guilt phase was admitted in the sanity phase.
Victor testified again for Petitioner.  Victor's review of
documents from Napa State Hospital, Atascadero State Hospital,
California Medical Facility at Vacaville, the Napa County jail and
the evaluations and reports of various doctors indicated that
Petitioner had a history of paranoid schizophrenia, psychosis and
polysubstance abuse, and that Petitioner had been arrested in 1999
for an unprovoked attack committed in a psychotic state under the
delusional belief that the victim intended to harm Petitioner's
family.  Before the 1999 attack, Petitioner had been seen pacing in
an agitated way in a parking lot, and his psychiatric records

indicated he had been hearing voices and responding to internal stimuli.  Records from Atascadero State Hospital indicated that in late 2000, after Petitioner had been found not guilty by reason of insanity, the dosage of his antipsychotic medication was decreased, and his behavior and thought processes deteriorated, necessitating a re-increase in dosage.  In April 2002, the month before Wagner's death, at a time when Petitioner was abusing drugs and his antipsychotic medications were interrupted, his behavior deteriorated, and he made unprovoked attacks on inmates.  In one of those attacks, while in a psychotic state, Petitioner attacked a peer who was lying in bed.  Victor's review of Petitioner's records indicated that, at the time he killed Wagner, Petitioner had not taken any medication for a little over forty hours, and Victor was of the opinion that as a result, the level of medication that protected Petitioner from psychosis had dropped drastically.  As a result, Petitioner's delusions would have become worse, he would misperceive events, and his behavior would get out of control.  In addition, Petitioner had been using methamphetamine during April 2002, and Victor testified that those drugs could still have been affecting Petitioner at the time of the murder.  Victor considered Petitioner's expressed motivation to kill Wagner--retribution for an unpaid drug debt--to be consistent with insanity.  Victor also testified that Petitioner's explanation of how blood got onto his clothing did not contradict a conclusion that he was insane, explaining that people in psychotic states can come up with explanations that they believe are rational.  In Victor's opinion, Petitioner's later inconsistent accounts of events did not indicate that Petitioner was not psychotic at the time he killed Wagner, and

United States District Court
For the Northern District of California

in fact it was likely that his accounts would become inconsistent as he had more aggressive antipsychotic treatment.  Victor noted that people with paranoid schizophrenia often have a "flat affect," as Petitioner did after Wagner was killed.  Although a doctor who saw Petitioner on April 24, 2002, had noted that Petitioner was not suffering hallucinations or delusions, in the ensuing days Petitioner had talked about his medication being poisoned, had been religiously preoccupied and had been pacing in an agitated manner the night before the murder, indicating decreased control over his paranoia.  Victor was of the opinion that Petitioner most likely understood the nature and quality of his acts when he killed Wagner, but that he was probably hallucinating and delusional at the time he did so, to the extent that he did not know the difference between right and wrong.

Victor testified on cross-examination that Petitioner had told him in May 2005--at a time he showed signs of psychosis--that everyone had a right to live, and that at the time Petitioner understood that it was morally wrong to take another person's life. In the interview, Petitioner told Victor that he did not have any idea how Wagner had died, he did not give a psychotic explanation for the killing and he said he had never been a recreational drug user.

Dr. Gregory Sokolov, a court-appointed psychiatrist, testified for the prosecution.  In a 2005 interview, Petitioner told Sokolov he had used marijuana, methamphetamine and crack cocaine at Napa State Hospital, and that he had made $200 to $300 a day selling items to other patients.  Petitioner said that in the days leading up to the killing, he was intoxicated, "drugged out" and not "in

11

his right mind," but denied having killed Wagner.  Sokolov agreed with the diagnoses Petitioner had received of paranoid schizophrenia, polysubstance dependence and antisocial personality disorder.  People with schizophrenia have periods in which they are not psychotic, in which they do not have acute mental symptoms.

Sokolov reviewed a test for malingering that Petitioner had taken in September 2002, and concluded Petitioner was faking his psychotic symptoms.  Two other court-appointed psychologists and one doctor in the jail in 2003 had also concluded Petitioner was malingering, or exaggerating his psychiatric symptoms.  Sokolov did not think Petitioner was delusional when he killed Wagner.  Sokolov based his opinion on the fact that two days before the murder, Petitioner's own psychiatrist noted that Petitioner was doing well and having no behavioral problems and that two days after the murder, jail workers had said Petitioner was "oriented [and] manipulative," with no mental health problems.  In Sokolov's interview with Petitioner, Petitioner did not show any delusional beliefs or paranoia toward Wagner, and Petitioner told Sokolov he was not hearing voices that night and had slept through the night. Sokolov did not believe pacing the floor the night before the murder was a psychotic symptom.  Sokolov believed Petitioner knew right from wrong at the time of the killing, based on the facts that Petitioner had given a false explanation for the blood on his clothing, he had not been having delusions and could therefore distinguish right from wrong and he had given conflicting explanations of events, also indicating that he was not operating under delusional beliefs and that he understood what he had done was wrong.

United States District Court
For the Northern District of California

1    Dr. Stephen Donoviel, a psychologist who had been appointed by
2  the court to evaluate Petitioner's sanity, also testified as an
3  expert witness for the prosecution.  When he interviewed Petitioner
4  in 2005, Petitioner told Donoviel he knew nothing about the murder.
5  According to Petitioner, he had gone to sleep and "woke up" when he
6  was being taken down the hall.  Petitioner told Donoviel that
7  Wagner was his best friend at the hospital, denied having
8  threatened to harm Wagner because of the drug debt and denied
9  selling drugs.  Petitioner said he had attacked two other patients
10  in April 2002 to "teach them a lesson" because they had been "bad
11  mouthing his business," which he said involved selling candy and
12  coffee.  Petitioner told Donoviel he was as "mean as a rattle
13  snake."  Petitioner also said that he knew that harming or killing
14  someone was morally, legally and religiously wrong.  Donoviel's
15  review of Petitioner's records showed that his physical and mental
16  condition improved over the course of April 2002.  In late March,
17  Petitioner had begun treatment for an abscess in his arm, which was
18  the result of using intravenous drugs.  The medical staff was
19  concerned because Petitioner had not been eating, and petitioned to
20  force feed him.  The request was denied in the middle of April,
21  because at that time Petitioner was thinking rationally.  Early in
22  April, there were entries in Petitioner's records indicating he was
23  confused, disoriented and delusional, but those symptoms abated
24  over the course of the month, and Petitioner's condition had
25  improved by the end of the month.  Near the end of that time,
26  entries indicated that Petitioner had been heard talking on the
27  phone in a cheerful voice and he was "[c]learly oriented," and
28  Donoviel concluded he was no longer confused.  In Donoviel's

opinion, Petitioner understood the nature and quality of his acts and could distinguish right from wrong when he killed Wagner.

On September 16, 2005, the jury found Petitioner was sane when he killed Wagner.  On October 28, 2005, Petitioner was sentenced to twenty-five years to life in state prison.  On October 6, 2006, Petitioner appealed his conviction to the California Court of Appeal.  On December 5, 2007, the state appellate court affirmed the judgment of conviction.  On January 15, 2008, Petitioner filed a petition for review in the California Supreme Court, which was denied on March 26, 2008.  Petitioner filed the instant federal habeas petition on September 17, 2008.

LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  A decision is contrary to clearly established federal law if it fails to apply the correct controlling authority, or if it applies the controlling authority to a case involving facts

materially indistinguishable from those in a controlling case, but nonetheless reaches a different result.  Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003).  A decision is an unreasonable application of federal law if the state court identifies the correct legal principle but unreasonably applies it to the facts of the prisoner's case.  Id.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is the holdings of the Supreme Court as of the time of the relevant state court decision.  Williams v. Taylor, 529 U.S. 362, 412 (2000).

To determine whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established law, a federal court looks to the decision of the highest state court that addressed the merits of a petitioner's claim in a reasoned decision.  LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  In the present case, the only state court to address the merits of Petitioner's claims is the California appellate court on direct review.

DISCUSSION

Petitioner raises four claims.  First, he alleges that the trial court erred by admitting statements he made to officers at the mental hospital because the statements were made in violation of Petitioner's rights under Miranda v. Arizona, 384 U.S. 436 (1966).  Second, Petitioner claims that the trial court erred by not sua sponte ordering a hearing on Petitioner's competence to stand trial.  Third, Petitioner asserts that the trial court impermissibly shifted the burden of proof in instructing the jury

15

regarding the effect of Petitioner's mental disorder on the requisite mental state for murder. Finally, Petitioner claims that the trial court committed instructional error during the sanity phase of his trial.

I.   <u>Miranda</u> Violation

Petitioner claims that his conviction was based on "non-Mirandized" statements he gave to officials at Napa State Hospital and that it was error for the trial court to admit these statements. Petitioner does not specify what statements should have been excluded from evidence. A review of Petitioner's opening brief on appeal, however, identifies two statements. Ex. C at 10. First, when one of the investigating officers asked Petitioner how Petitioner had cut his hand, Petitioner stated that he had punched a wall in the courtyard the day before. <u>Id.</u> Second, when the officer asked Petitioner how Petitioner had gotten blood on his knee, Petitioner stated that he had fallen down in the courtyard. <u>Id.</u>

Petitioner claims that these two statements, which were given without a <u>Miranda</u> warning, contradicted his guilt-phase defense that he was acting under a schizophrenic episode, because a jury could have inferred that the explanations showed a consciousness of guilt. <u>Id.</u> at 29. Further, Petitioner asserts the statements contradicted his insanity defense because Dr. Sokolov used the statements to opine that Petitioner knew right from wrong insofar as he knew enough to come up with an excuse to hide his behavior. <u>Id.</u> at 29-30.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

A.   State Appellate Court Opinion Addressing Petitioner's
Claim

The state appellate court did not decide whether Petitioner's
<u>Miranda</u> rights were violated.  Instead the court rejected the claim
on the grounds that admission of the statements was harmless beyond
a reasonable doubt under the federal prejudice standard.  <u>People v.
Gore</u>, 2007 WL 4248859 at *9-11 (citing <u>Arizona v. Fulminante</u>, 499
U.S. 279, 313 (1991)).

B.   Analysis of Petitioner's Claim Under AEDPA

<u>Miranda</u> requires that a person subjected to custodial
interrogation be advised that he has the right to remain silent,
that statements made can be used against him, that he has the right
to counsel and that he has the right to have counsel appointed.
<u>See</u> <u>Miranda</u>, 384 U.S. at 444.  These warnings must precede any
custodial interrogation, which occurs whenever law enforcement
officers question a person after taking that person into custody or
otherwise significantly deprive a person of freedom of action.  <u>Id.</u>
<u>Miranda</u> protections are triggered "only where there has been such a
restriction on a person's freedom as to render him 'in custody.'"
<u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994) (citing <u>Oregon v.
Mathiason</u>, 429 U.S. 492, 495 (1977)).  "[I]n custody" requires that
"a reasonable person [would] have felt he or she was not at liberty
to terminate the interrogation and leave," as judged by the
totality of the circumstances.  <u>Thompson v. Keohane</u>, 516 U.S. 99,
112 (1995).  Habeas relief should be granted if the admission of
statements in violation of <u>Miranda</u> "had a substantial and injurious
effect or influence in determining the . . . verdict."  <u>Juan H. v.</u>

17

1   <u>Allen</u>, 408 F.3d 1262, 1271 n.9 (9th Cir. 2005)(quoting <u>Brecht v.</u>

2   <u>Abrahamson</u>, 507 U.S. 619, 637 (1993)).

3       The Court need not decide whether Petitioner's <u>Miranda</u> rights

4   were violated because Petitioner has not shown that the statements

5   had a substantial and injurious effect on the jury's verdict.  As

6   noted by the appellate court, in both phases of Petitioner's trial,

7   evidence of guilt was overwhelming, and the two statements

8   regarding Petitioner's injuries were only a small part of the

9   prosecution's case.

10      While Petitioner is correct that Dr. Sokolov used the

11  statements to opine that Petitioner knew right from wrong (Ex. A,

12  vol. 1 at 188), there was plentiful other evidence of Petitioner's

13  guilt and state of mind.  For example, Petitioner had Wagner's

14  blood on his clothing.  Ex. B at 3850, 3884, 4388-90.  In the days

15  leading up to the murder, Petitioner had told numerous people that

16  he was going to harm Wagner due to the debt Wagner owed Petitioner.

17  <u>Id.</u> at 3899, 3911-13, 3916, 4059-61, 4305-06.  Petitioner had

18  stated on the evening before Wagner's death that he would kill

19  Wagner.  <u>Id.</u> at 4305-08, 4312.  Testing showed that Petitioner's

20  blood did not contain any drugs after or during the attack on

21  Wagner.  <u>Id.</u> at 4473-74.  The evidence also showed that Petitioner

22  was calm and cooperative after Wagner was discovered dead and that

23  he had an apparent understanding of his surroundings and the

24  staff's directions.  <u>Id.</u> at 3689, 3851-53, 3866, 3868-73, 3888,

25  3890-91, 3923-24, 3956-58, 4513-14, 4522, 4525.  Petitioner

26  responded appropriately to questions and commands and did not

27  appear to have any psychotic problems at the time.  <u>Id.</u>  Dr.

28  Sokolov noted the absence of reported or observed delusions in the

days before and after the event.  Ex. B at 6714; Ex. A, vol. 1 at 187.  Dr. Sokolov also noted that Petitioner made changing explanations of the events, which is uncharacteristic of someone operating under a delusional conviction.  Ex. B at 6708-09; Ex. A, vol. 1 at 188.  The evidence also included reports showing that Petitioner's mental state had improved by the end of April 2002.  Ex. A, vol. 1 at 185-87; Ex. A, vol. 3 at 52-53.  Petitioner's treating psychologist opined that Petitioner was faking mental illness and testified that Petitioner even admitted to malingering.  Ex. B at 5293-96.  Other court-appointed psychologists agreed that Petitioner was malingering.  Id. at 6705-06.  Another expert opined that Petitioner was not showing withdrawal symptoms at the time of the killing and that Petitioner was being adequately treated for his psychiatric problems.  Id. at 5329-31, 5336-37, 5353, 5355.  Finally, Petitioner himself reported that he understood right from wrong and knew that it was morally, legally and religiously wrong to kill another person.  Id. at 5824-25.  Based on the strong case against Petitioner, the court of appeal reasonably found that there was no resulting prejudice to Petitioner from the admission of the two statements.

Accordingly, Petitioner has not demonstrated a reasonable probability that the result of the proceeding would have been different had the statements been excluded.  The state court's rejection of this claim was neither contrary to, nor an unreasonable application of, federal law.

//

//

**United States District Court**
For the Northern District of California

## II.  Competency Hearing

Petitioner claims he was denied due process when the trial court failed to order a hearing sua sponte on Petitioner's competency to stand trial.  In August 2002, defense counsel expressed doubt in Petitioner's competency under Cal. Penal Code § 1368.[3]  Ex. B at 303-04.  The trial court appointed two psychologists to examine Petitioner.  Id.; Ex. A, vol. 1 at 21. Both concluded that Petitioner was feigning the nature or degree of his psychotic symptoms.  Ex. A, vol. 3 at 14-29; Ex. B at 452.  At the request of defense counsel, the trial judge then appointed a psychiatrist to examine Petitioner.  Ex. A, vol. 1 at 26; Ex. B at 355-56.  The psychiatrist concluded that Petitioner was able to understand the charges against him and assist counsel in presenting a rational defense.  Ex. A, vol. 3 at 31-35.  In January 2003, the trial court found Petitioner competent to stand trial based on the three expert evaluations.  Ex. A, vol. 1 at 42; Ex. B at 555.

On June 28, 2004, Petitioner personally presented a written motion for appointment of new counsel, which was granted based on a breakdown in the relationship between Petitioner and defense counsel.  Ex. A, vol. 1 at 107; Ex. B at 1931-32.  The trial court appointed new defense counsel.  Id.

---

[3] Cal. Penal Code § 1368(b) states in relevant part:

> If counsel informs the court that he or she believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be determined in a hearing.

United States District Court
For the Northern District of California

Subsequently, in April 2005, Napa County Counsel applied ex parte for an order transferring Petitioner from the Napa County jail to the California Medical Facility in Vacaville (CMF).  Ex. A, vol. 1 at 143-44.  The application stated that Petitioner had injured himself by hitting his head against a steel bunk and running headlong into a wall.  Id.  Petitioner had also assaulted correctional officers and was refusing to take his psychotropic medications.  Id.  County counsel argued that CMF could supervise and medicate Petitioner more effectively than the county jail could.  Id.  Petitioner's new counsel submitted the issue on the ex parte application and notified the court that Petitioner was requesting medical attention.  Ex. B at 2402.  On May 2, 2005, the trial court granted the order, and Petitioner was transferred to CMF.  Ex. A, vol. 1 at 147-49.

At a hearing on June 1, 2005, the trial court considered where Petitioner should be housed during trial.  Ex. A, vol. 1 at 160; Ex. B at 2555-64.  Defense counsel expressed a need to confer with Petitioner outside of trial hours each day and told the court that Petitioner "[did] well when he's taking his meds and when he's properly medicated."  Ex. B at 2558.  County counsel urged the court to continue housing Petitioner at CMF where Petitioner had resumed taking his medication.  Id. at 2560.  The trial court continued Petitioner's housing at CMF but ordered that he be brought to court early on trial mornings.  Ex. A, vol. 1 at 161-62; Ex. B at 2563-64.

At the same hearing, Petitioner personally entered a plea of not guilty and not guilty by reason of insanity.  Ex. A, vol. 1 at 160; Ex. B at 2569.  The prosecution then asked whether defense

counsel was raising a doubt about Petitioner's competence to stand trial.  Ex. B at 2577.  Defense counsel responded, "I'm not."  <u>Id.</u> The trial judge stated that her review of Dr. Victor's report did not raise those issue in her mind and that nothing about Petitioner's conduct in court raised a doubt.  <u>Id.</u> at 2577-78. After being offered an opportunity to comment further on Petitioner's competency, defense counsel stated, "I don't have doubt at this time."  <u>Id.</u> at 2578.

Also on June 1, 2005, the trial court appointed Dr. Sokolov and Dr. Donoviel under Cal. Penal Code § 1027, which requires the trial court to appoint experts to evaluate a plea of insanity.  Ex. A, vol. 1 at 160; Ex. B at 2575.  Both doctors interviewed Petitioner and issued reports in June 2005.  Ex. A, vol. 1 at 182-89; Ex. A, vol. 3 at 42-57.  While these experts were appointed in connection with Petitioner's plea and not with regard to Petitioner's competence to stand trial, neither expert suggested that Petitioner was not competent to be tried.  <u>Id.</u>  The Court also notes that both experts opined that Petitioner was sane at the time of the offense.  Ex. A, vol. 1 at 187-89; Ex. A, vol. 3 at 57.  Dr. Donoviel indicated that Petitioner cooperated with the interview, was "fully alert and correctly oriented to time, place, person and situation," showed a good sense of humor and appropriate range of emotions and did not appear to be preoccupied or responding to internal stimuli.  Ex. A, vol. 3 at 54.  Dr. Sokolov also indicated that Petitioner cooperated with the interview and said he was pleading insanity on his lawyer's advice.  Ex. A, vol. 1 at 182, 184.

22

In July 2005, county counsel informed the trial court that the treating psychiatrist at CMF had discharged Petitioner from the acute psychiatric ward.  Ex. A, vol. 1 at 176-81.  The trial court ordered Petitioner returned to county jail.  Ex. A, vol. 1 at 190-91; Ex. B at 2705-06.  Jury selection began on August 22, 2005.  Ex. A, vol. 1 at 208.

Petitioner claims that his April 2005 conduct--resulting in his transfer to CMF--presented evidence of a change in his psychiatric condition, such that the trial court should have reconsidered its earlier competency determination and sua sponte ordered a competency hearing.

A.   State Appellate Court Opinion Addressing Petitioner's Claim

The state appellate court analyzed Petitioner's claim under Cal. Penal Code § 1368, which requires the court to order a competency hearing if "a doubt arises in the mind of the judge as to the mental competence of the defendant" or "[i]f counsel informs the court that he or she believes the defendant is or may be mentally incompetent."  The appellate court rejected Petitioner's claim, noting that Petitioner's own counsel expressed that he did not doubt Petitioner's competence and noting that Petitioner was again taking his medications by the time of trial.  People v. Gore, 2007 WL 4248859 at *9.  The appellate court also noted that nothing in the reports of the appointed experts nor in the report of the defense expert indicated that Petitioner would be incompetent when properly medicated.  Id.  The court found no substantial evidence suggesting Petitioner's inability to understand the proceedings against him or to consult rationally with his lawyer.  Id.

B.  Analysis of Petitioner's Claim Under AEDPA

        The test for competence to stand trial is whether the defendant demonstrates the ability "'to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'" Godinez v. Moran, 509 U.S. 389, 396 (1993)(quoting Dusky v. United States, 362 U.S. 402, 402 (1960)).  Due process requires a trial court to order a psychiatric evaluation or conduct a competency hearing sua sponte if the court has a good faith doubt concerning the defendant's competence.  Pate v. Robinson, 383 U.S. 375, 385 (1966).  A good faith doubt about a defendant's competence arises if "'a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial.'" Maxwell v. Roe, 606 F.3d 561, 568 (9th Cir. 2010) (quoting de Kaplany v. Enomoto, 540 F.2d 975, 983 (9th Cir. 1976)).  "In reviewing whether a state trial judge should have conducted a competency hearing, we may consider only the evidence that was before the trial judge." McMurtrey v. Ryan, 539 F.3d 1112, 1119 (9th Cir. 2008).  "'[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required,' and 'one of these factors standing alone may, in some circumstances, be sufficient.'" Maxwell, 606 F.3d at 568 (quoting Drope v. Missouri, 420 U.S. 162, 180 (1975)).

        Here, it is undisputed that Petitioner had a history of psychiatric disorders, including court-ordered time at a state

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   mental hospital.  Ex. B at 6604-17.  Further, it is undisputed that

2   Petitioner was previously found not guilty by reason of insanity

3   for a 1999 assault.  <u>Id.</u>; <u>People v. Gore</u>, 2007 WL 4248859 at *1,

4   n.2.  The record shows no prior medical opinion, however, finding

5   Petitioner incompetent to stand trial.  And none of the expert

6   opinions gathered for Petitioner's 2005 trial on the underlying

7   offense, including that of the defense expert, suggested that

8   Petitioner was incompetent.  Ex. A, vol. 1 at 182-89; Ex. A, vol. 3

9   at 36-41, 42-57.  The three psychological and psychiatric reports

10  ordered by the trial court in 2002 all concluded that Petitioner

11  was competent.  Ex. A, vol. 3 at 14-29, 31-35.  Later reports by

12  Dr. Donoviel and Dr. Sokolov, issued two months before trial,

13  showed that Petitioner was cooperative and capable of understanding

14  their interview questions.  Ex. A, vol. 3 at 54; Ex. A, vol. 1 at

15  182, 184.  And both opined that Petitioner was sane at the time of

16  the offense.  Ex. A, vol. 1 at 187-89; Ex. A, vol. 3 at 57.

17  Further, defense counsel denied having any doubt as to Petitioner's

18  ability to stand trial and stated that Petitioner did well when

19  properly medicated.  Ex. B at 2577-77.  The CMF treating

20  psychiatrist reported that Petitioner was back on his medication in

21  July 2005.  Ex. A, vol. 1 at 180-81.  The trial judge noted that

22  she also did not notice anything out of the ordinary.  Ex. B at

23  2577-78.  It appears that the Petitioner's demeanor and behavior

24  throughout the proceedings, the expert reports and the statements

25  of county counsel and defense counsel were the only evidence

26  considered by the trial court and, therefore, the only evidence

27  this Court is to consider in determining whether the trial court

28  should have ordered a competency hearing.  <u>See</u> <u>McMurtrey</u>, 539 F.3d

United States District Court
For the Northern District of California

at 1119; <u>Amaya-Ruiz v. Stewart</u>, 121 F.3d 486, 493 (9th Cir. 1997). A review of this evidence shows no reason why the trial court should have had a good faith doubt regarding Petitioner's competence.  <u>See</u> <u>Maxwell</u>, 606 F.3d at 568.

The Ninth Circuit issued its recent opinion in <u>Maxwell v. Roe</u>, 606 F.3d 561, 568 (9th Cir. 2010) subsequent to the briefing in this case.  <u>Maxwell</u> granted federal habeas relief to a petitioner where the trial court failed to conduct a second competency hearing despite substantial evidence that the petitioner's psychiatric condition had worsened following an initial competency finding. This Court has considered the opinion and finds it distinguishable from the present case.

In <u>Maxwell</u>, the petitioner was ordered to undergo a competency determination after defense counsel expressed doubt about his ability to stand trial.  <u>Id.</u> at 564.  Four of five psychiatrists concluded that Maxwell was malingering, or feigning a psychosis, while the fifth concluded that Maxwell was indeed incompetent to stand trial.  <u>Id.</u> at 565.  The trial judge subsequently found Maxwell competent and reinstated criminal proceedings.  <u>Id.</u>  By the time trial commenced thirteen months later, Maxwell's behavior had become uncontrollable, and defense counsel repeatedly alerted the court that Maxwell's condition was worsening and that communication with Maxwell was severely strained.  <u>Id.</u> at 565.  During pretrial proceedings, Maxwell made noises and blurted out obscenities.  <u>Id.</u> at 569.  He refused to take his medication and had assaulted another inmate with a knife.  <u>Id.</u>  Following one physical and verbal outburst in the courtroom, the trial judge found that Maxwell posed a danger and had him removed.  <u>Id.</u> at 570.  As a

result, the trial proceeded in Maxwell's absence.  Id. at 565.
Halfway through the trial, Maxwell attempted suicide with a razor
blade and was placed by hospital staff on a seventy-two hour
"psychiatric hold" or detention that later was extended to a two-
week hold.  Id. at 570-71.  The Ninth Circuit concluded that, in
light of the psychiatric holds, "[n]o reasonable judge . . . could
have proceeded with the trial without doubting Maxwell's competency
to stand trial."  Id. at 573.

    The Ninth Circuit also observed that, had the trial court
conducted an additional competency hearing, it "would have
discovered further information suggesting Maxwell's incompetence,"
specifically the reports from the psychiatric holds explicitly
finding that Maxwell was "actively psychotic" and that he had been
"involuntary [sic] administered heavy doses of [an] antipsychotic
drug."  Id.  Additionally the appellate court noted that the report
first relied upon by the trial judge, which concluded Maxwell had
been malingering, was "thirteen months old," "was itself based on
aging psychiatric evaluations that were, by the time of Maxwell's
trial, eighteen months old" and that Maxwell's condition had
deteriorated significantly in the intervening time.  Id. at 575.

    Here, in contrast, defense counsel did not voice continuing
concern about Petitioner.  While the failure of a defendant or his
attorney to request a competency hearing is not a factor in
determining whether there is a good faith doubt in the defendant's
competency, Maxwell, 606 F.3d at 574, this was not a "failure to
request" case.  As discussed above, the trial judge specifically
inquired of defense counsel whether there was any need for a second
competency determination, and defense counsel specifically stated

United States District Court
For the Northern District of California

that he did not doubt Petitioner's competence to stand trial.  <u>See</u>
<u>Williams v. Woodford</u>, 384 F.3d 567, 607-610 (9th Cir. 2004)
(affording significant weight to defense counsel's firm belief that
defendant was competent and, in the absence of "persuasive"
evidence to the contrary, concluding that defendant did not
establish a violation of his right not to be tried and convicted
while incompetent); see also <u>United States v. Clark</u>, 617 F.2d 180,
186 n.11 (9th Cir. 1980) ("The fact that [the defendant's] attorney
apparently considered him competent is significant evidence that he
was competent.").

Further, as discussed above, defense counsel also informed the
trial judge that Petitioner did well when taking his medication
(Ex. B at 2558), and the record shows that Petitioner was back on
medication at the time of his trial and well enough to be returned
to county jail.  Ex. A, vol. 1 at 176-81.  The record also shows
that defense counsel was communicating directly with Petitioner
during trial.  Ex. B at 2558-59, 2563-64.  <u>See</u> <u>Stanley v. Culler</u>,
633 F.3d 852, 860 (2011) (defense counsel, while agreeing that
client was difficult to control, informed the court that they could
ensure his competence by taking measures such as getting him proper
medication or communicating with him directly).  Finally, it
appears from the record that Petitioner was coherent in his brief
colloquies with the court (Ex. B at 2568-69, 2617), and did not
disrupt proceedings.  The trial judge noted at one point that
nothing in Petitioner's demeanor raised a doubt to the court.  Ex.
B at 2577-78.  <u>See</u> <u>Stanley</u>, 633 F.3d at 861 (not unreasonable for
trial court to conclude there was not enough evidence before it to
raise a doubt about defendant's competence where defendant was

coherent in his testimony and colloquies with the court, and state court judges indicated his demeanor in courtroom did not raise a doubt about his competency).

Nor does the record suggest there were later findings by treatment staff that would have permitted the inference Petitioner was incompetent, in contrast to <u>Maxwell</u>. Indeed, as noted above, later evaluations found that Petitioner was cooperative and communicative and opined that Petitioner was sane at the time of the offense. And Petitioner's discharge papers from CMF described him as "calm, cooperative, pleasant" and reported that he "denie[d] hallucinations or suicidal intent." Ex. A, vol. 1 at 181. The evaluation presented by Petitioner's own psychological expert nowhere suggested that Petitioner would be unable to stand trial. There is nothing in the record to show that Petitioner could not assist counsel or understand the proceedings against him at the time of trial. <u>Godinez</u>, 509 U.S. at 396. Accordingly, <u>Maxwell</u> does not mandate federal habeas relief here. Especially in light of the highly deferential standard this Court must give to the state court's factual finding, <u>see</u> <u>Stanley</u>, 633 F.3d at 859, the state court's decision rejecting this claim was not contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d).

III. Jury Instruction On Effect Of Mental Disorder On Mental State

Petitioner claims that the trial court erred in its instruction to the jury on the mental state required for first degree murder. Specifically, the trial court instructed the jury with a modified version of CALJIC No. 4.21.1 as follows:

**United States District Court**
For the Northern District of California

> It is the general rule that no act committed by
> a person with a mental disorder is less
> criminal by reason of that condition.  Thus in
> the crime of first degree murder as charged in
> Count One, or the crime of second degree
> murder, which is a lesser thereto, the fact
> that the defendant had a mental disorder is not
> a defense and does not relieve defendant of
> responsibility for the crime.  However there is
> an exception to this general rule, namely where
> a specific intent or mental state is an
> essential element of the crime.  In that event
> you should consider the defendant's mental
> disorder in deciding whether the defendant
> possessed the required specific intent or
> mental state at the time of the commission of
> the alleged crime.  [¶] Thus in the crime of
> first degree murder charged in Count One or the
> lesser crime of second degree murder, a
> necessary element is the existence in the mind
> of the defendant of a certain specific intent
> or mental state which is included in the
> definition of the crime set forth elsewhere in
> these instructions.  If the evidence shows that
> a defendant had a mental disorder at the time
> of the alleged crime you should consider that
> fact in deciding whether or not defendant had
> the required specific intent or mental state.
> If from all the evidence you have a reasonable
> doubt whether the defendant had a required
> specific intent or mental state you must find
> that the defendant did not have that specific
> intent or mental state.

Ex. A, vol. 2 at 430; Ex. B at 5551-52.

Petitioner claims that this instruction impermissibly shifted the burden to the defense to prove that Petitioner did not harbor the requisite mental state for first degree murder.

A.   State Appellate Court Opinion Addressing Petitioner's
     Claim

The state court of appeal rejected Petitioner's claim, finding that nothing in the instruction directed the jury to find that Petitioner acted with the intent to kill.  <u>People v. Gore</u>, 2007 WL 4248859 at *12.  To the contrary, the jury was instructed that if it had a reasonable doubt whether Petitioner had the required

mental state, it must find for the defense.  Id.  The appellate court also noted that the instructions as a whole properly instructed the jury that the prosecution had the burden of proof on each fact necessary to establish guilt.  Id.

B.  Analysis of Petitioner's Claim Under AEDPA

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  Id. at 72.  The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  Id.

Petitioner does not show how the challenged instruction so infected his trial.  The instruction did not require the jury to find that Petitioner acted with specific intent to kill.  Rather the instruction directed the jurors to find that he did not have such intent if the jury had a reasonable doubt.  Petitioner simply does not show how the instruction shifted, or in any way lessened, the prosecution's burden to prove Petitioner guilty beyond a reasonable doubt as to each element of the crime, after taking his mental disorder into consideration.  Looking at the record as a whole, the instructions given adequately placed the burden on the prosecution.  Accordingly, the state court's denial of this claim was not contrary to, or an unreasonable application of, established federal authority.

United States District Court
For the Northern District of California

31

1   //

2

3   IV.   Jury Instruction During Sanity Phase

4

5        Petitioner claims the trial court committed instructional

6   error in the sanity phase of his trial.   Specifically, Petitioner

7   challenges the trial court's use of an instruction requiring

8   Petitioner to prove legal insanity by a preponderance of the

9   evidence.   While not specified in his petition, Petitioner's

10  argument on direct appeal was that his prior adjudication of legal

11  insanity in 1999 should have been presumed to have continued.   Ex.

12  C at 40-42, 55-56.   While also not stated in the instant petition,

13  Petitioner raised a second argument on direct appeal challenging

14  the trial court's instruction to the jury on the use of

15  circumstantial evidence.   <u>Id.</u> at 57-59.   Specifically, the trial

16  court instructed the jury as follows:

17              Each fact which is essential to complete a set
            of circumstances necessary to establish the
18          defendant's insanity must be proved by a
            preponderance of the evidence.   In other words,
19          before an inference essential to establish
            insanity may be found to have been proved by a
20          preponderance of the evidence, each fact or
            circumstance on which the inference necessarily
21          rests must be proved by a preponderance of the
            evidence.   [¶] <u>Also if the circumstantial</u>
22          <u>evidence permits two reasonable</u>
            <u>interpretations, one which points to the</u>
23          <u>defendant's insanity, the other to his sanity,</u>
            <u>you must adopt the interpretation that points</u>
24          <u>to the defendant's sanity and reject the</u>
            <u>interpretation that points to his insanity.</u>
25          If, on the other hand, one interpretation of
            the evidence appears to you to be reasonable,
26          the other interpretation to be unreasonable,
            you must accept the reasonable interpretation
27          and reject the unreasonable.

28

United States District Court
For the Northern District of California

Ex. B at 6797; Ex. A, vol. 2 at 544 (emphasis added).  Petitioner argued on appeal that the underlined language misstated his burden. Ex. C at 57-59.  The Court will construe the petition as raising the same two instructional error claims raised on appeal.

A.   State Appellate Court Opinion Addressing Petitioner's
     Claim

     The state appellate court rejected Petitioner's first claim noting that, under California law, insanity is an affirmative defense to a criminal charge, and a defendant has the burden of proving it by a preponderance of the evidence.  <u>People v. Gore</u>, 2007 WL 4248859 at *13.  The court rejected Petitioner's argument that an exception should apply where there has already been a prior finding of insanity.  <u>Id.</u> at *13-14.  Specifically, Petitioner argued that such a prior finding should create a rebuttable presumption of insanity, shifting the burden to the prosecution. <u>Id.</u> at *14.  The court noted that California case law, specifically <u>People v. Wolff</u>, 61 Cal. 2d 795, 816-18 (1964), had already considered and rejected such an exception, maintaining with the defendant the burden of proving insanity by a preponderance of the evidence.  <u>Id.</u>

     The appellate court agreed with Petitioner's second argument that the instruction on use of circumstantial evidence misstated Petitioner's burden.  <u>Id.</u> at *14-15.  The court noted that the instruction was adapted from CALJIC No. 2.01, which informs the jury on how to evaluate circumstantial evidence when determining whether the prosecution has met its burden of proving guilt beyond a reasonable doubt.  <u>Id.</u>  In such context, the prosecution has not met its burden where one reasonable interpretation of the evidence

**United States District Court**
For the Northern District of California

33

points to innocence.  <u>Id.</u>  But by applying this instruction to the sanity phase, the trial court erroneously raised Petitioner's burden beyond a preponderance of the evidence.  <u>Id.</u>  The appellate court nonetheless rejected Petitioner's instructional error claim, finding that the error was harmless.  <u>Id.</u> at *16.  The court again pointed out the overwhelming evidence against Petitioner, including the circumstances of the murder, Petitioner's own statements and expert opinion that Petitioner knew right from wrong.  <u>Id.</u>  The appellate court also rejected the claim on the basis that the jury was elsewhere correctly instructed as to Petitioner's burden of proof.  <u>Id.</u> at *17.

B.  Analysis of Petitioner's Claim Under AEDPA

As noted above, a challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings.  <u>Estelle</u>, 502 U.S. at 71-72.  A federal due process violation arises only if the instruction rendered the entire trial unfair.  <u>Estelle</u>, 502 U.S. at 72.  Moreover, the standard for a finding of insanity is a matter of state law and is not of federal constitutional dimension.  <u>Leland v. Oregon</u>, 343 U.S. 790, 798-99 (1952).  A state law imposing a high burden of proof of insanity, including proof beyond a reasonable doubt, does not violate due process.  <u>Id.</u>

Here, given the overwhelming evidence against Petitioner and the instructions as a whole, the appellate court reasonably concluded that any error was harmless.  <u>See</u> <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993).  As detailed above, evidence of Petitioner's sanity at the time of the murder was substantial.  By way of example only, the experts appointed by the trial court both

34

United States District Court
For the Northern District of California

opined that Petitioner was sane (Ex. A, vol. 1 at 187-89; Ex. A, vol. 3 at 56-57) and several witnesses testified that Petitioner was cooperative, alert and oriented following the discovery of Wagner's murder.  Ex. B at 3689, 3851-53, 3866, 3868-73, 3888, 3890-91, 3923-24, 3956-58, 4513-14, 4522, 4525.  Further, the trial court gave the jury other proper instructions on Petitioner's burden to prove insanity by a preponderance of the evidence.  Ex. A, vol. 2 at 551, 557, 563.  See Middleton v. McNeil, 541 U.S. 433, 437-38 (2004) (state court reasonably found no due process violation where trial court gave at least three correct instructions on unreasonable self-defense and one admittedly incorrect instruction).  Accordingly, Petitioner does not show that the error had a substantial and injurious effect on the verdict. Brecht, 507 U.S. at 623.

Based on the above, the state court's denial of this claim was not contrary to, or an unreasonable application of, established federal authority.

CONCLUSION

For the foregoing reasons, the Petition for a Writ of Habeas corpus is DENIED.

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a certificate of appealability (COA) under 28 U.S.C. § 2253(c) is GRANTED as to Petitioner's competency hearing claim.  The Court finds that reasonable jurists viewing the record could find the Court's assessment of this claim "debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Because Petitioner has failed to make a substantial showing that any of his other claims amounted

to a denial of his constitutional rights or demonstrate that a reasonable jurist would disagree with this Court's assessment, a COA is DENIED as to all other claims.  The COA on Petitioner's competency hearing claim does not obviate the requirement that Petitioner file any notice of appeal within thirty (30) days of this order

The Clerk shall terminate any pending motions as moot, enter judgment in favor of Respondent and close the file.

IT IS SO ORDERED.

Dated: **8/15/2011**

CLAUDIA WILKEN
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

ANTHONY C. GORE,

Case Number: CV08-04365 CW

       Plaintiff,

**CERTIFICATE OF SERVICE**

  v.

ROBERT A. HOREL et al,

       Defendant.

_____/

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on August 15, 2011, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Anthony Clark Gore F-01081

California Medical Facility

P.O. Box 2000

M-229-L

Vacaville, CA 95696-2000

Dated: August 15, 2011

                                 Richard W. Wieking, Clerk

                                 By: Nikki Riley, Deputy Clerk